UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 00-6211-CR-HURLEY/VITUNAC (s)

UNITED STATES OF AMERICA

    Plaintiff,

vs.

RAED NASER ALDIN,

    Defendant.
_____/



## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on general Order of Reference from United States District Judge Daniel T.K. Hurley for disposition of and/or report and recommendation with respect to all pretrial criminal motions.

Before the Court is Defendant, RAED NASER ALDIN's, Motion to Suppress Statements (DE 377). This Court has reviewed Defendant's Motion to Suppress Statements and the Government's Response to Motion to Suppress Statements (DE 380) and on June 11, 2001, this Court conducted an evidentiary hearing with respect to the issues raised by the Defendant with respect to the Motion. The matter is ripe for review.

Defendant's Written Motion

Defendant contends that on or about June 1, 2000, agents from the Drug Enforcement Administration began surveillance of a townhouse located at 704 Broughton Circle, Building 6, Boynton Beach, Florida. DEA agents received information from a source who indicated that the Defendant, ALDIN, and co-defendant, Jaber, were transporting pseudoephedrine in a U-Haul truck

from a warehouse facility in Ft. Lauderdale, Florida to the garage of the townhouse located at 704 N. Broughton Circle in Boynton Beach. ALDIN and Jaber "were observed unloading unknown objects into the garage."

Defendant contends that on June 5, 2000, Special Agent Joseph Collins prepared an affidavit and search warrant that was served and executed that evening at 704 N. Broughton Circle, Building 6, Boynton Beach, Florida. The Motion indicates that the search yielded approximately 118 boxes of pseudoephedrine in bottle form and 31 boxes of pseudoephedrine in loose pills. Defendant's Motion argues that the affidavit did not indicate ALDIN's knowledge of the contents in the boxes transported and unloaded into the garage at that location. Defendant argues that the Government knew the person who was responsible for the pseudoephedrine and that this person was licensed to distribute it, but this information was not included in the agent's affidavit. This omission constitutes a false statement and could invalidate the search warrant.

On June 5, 2000, a traffic stop was initiated on a car occupied by ALDIN. The law enforcement officer stopped the car ALDIN was in and questioned ALDIN for the purpose of gathering information. ALDIN alleges that the law enforcement officer did not advise him of his rights per <u>Miranda</u>. ALDIN also argues that the traffic stop was without reasonable suspicion or probable cause and the only basis for the stop and interrogation was because he had been seen at that location on one other occasion.

ALDIN further argues that, "It is not a crime to simply possess pseudoephedrine by itself. It is only criminal to possess pseudoephedrine with the intent to use it to manufacture methamphetamine."

2

## Government's Written Response

Government contends that the Defendant, ALDIN, was stopped on June 3, 2000, by a Boynton Beach police officer. At that time he identified himself as ALDIN RAED NASSER (his name is RAED NASER ALDIN). He again was stopped on June 5, 2000, after conducting counter-surveillance in the Target store parking lot in Boynton Beach. He was read his <u>Miranda</u> rights. He agreed to speak to the agents and informed the agents that he spoke little English (although they were able to communicate with him.) He claimed that he had never been to 704 N. Broughton Circle. The Government contends that law enforcement officers had reasonable suspicion to stop the car ALDIN was driving.

Government argues that ALDIN voluntarily waived his rights and was aware of the consequences of waiving those rights. After being advised of his <u>Miranda</u> rights, ALDIN chose to make statements in an effort to distance himself from the activity occurring in the townhouse.

On June 5, 2000, Defendant, ALDIN, was stopped by law enforcement officers. Defendant made statements to a law enforcement officer after the traffic stop after leaving the townhouse located at 704 N. Broughton Circle in Boynton Beach. Defendant argues there was no probable cause or reasonable suspicion to stop him and therefore any stop was invalid.

The Government contends that DEA agents had been conducting surveillance at a Shurguard Storage Facility and at a townhouse located at 704 N. Broughton Circle. The agents "observed massive quantities of pseudoephedrine, a precursor in the manufacture of methamphetamine, leaving the warehouse under suspicious circumstances." The agents also observed ALDIN and others at the townhouse located at 704 N. Broughton Circle acting in a suspicious manner. The Government argues that there was probable cause to search the townhouse and reasonable suspicion to stop

ALDIN.

Government's Response indicates that on June 1, 2000, agents conducting surveillance on the warehouse observed ALDIN and co-defendant, Jaber, back a U-Haul truck into Unit 206 at the Shurguard Storage Facility. The agents then proceeded to follow ALDIN and Jaber to the townhouse located at 704 N. Broughton Circle in Boynton Beach. Agents observed ALDIN and Jaber deliver the U-Haul truck filled with several hundred boxes of pseudoephedrine to the garage of the townhouse. Agents followed ALDIN and Jaber as they repeated this activity three hours later, with additional boxes of pseudoephedrine delivered to the townhouse.

On the morning of June 6, 2001, agents observed an individual in a white Pontiac Sunbird conducting counter-surveillance at the Target store parking lot in Boynton Beach. The Sunbird was also observed from June 1, 2000 through June 5, 2000, arriving and leaving the townhouse at 704 N. Broughton Circle. Government contends that agents stopped the Pontiac Sunbird driven by the Defendant.

ALDIN was read his <u>Miranda</u> rights prior to any statements being made. When asked about the bottles in his car, ALDIN advised the agents that the bottles of pseudoephedrine found in his car were for a cold. ALDIN denied that he had ever been to 704 N. Broughton Circle.

ALDIN was observed loading and unloading massive quantities of pseudoephedrine from the Shurguard Storage Facility into a U-Haul truck. He was observed driving the truck to a residence at 704 N. Broughton Circle and unloading the pseudoephedrine. He was observed conducting counter-surveillance while in the vicinity of the townhouse. He was observed discarding thousands of empty pseudoephedrine pills in trash dumpsters.

4

## The Evidentiary Hearing

Two witnesses testified at the evidentiary hearing on ALDIN's Motion to Suppress. Mike Baker is a special agent with the United States Drug Enforcement Administration. He has been in law enforcement for the past fifteen years. In Baker's first five years of law enforcement he worked with the Brevard County Sheriff's Department in Melbourne, Florida. He has spent the past ten years with the Drug Enforcement Administration. Baker has a four year college degree with a Bachelor of Science in Criminology. Joseph Collins testified. Collins has been with the United States Drug Enforcement Administration for the past three years. He has an accounting degree from Newman College in Philadelphia.

According to Special Agent Baker the Drug Enforcement Administration began a national investigation involving the shipment of pseudoephedrine throughout the United States which pseudoephedrine resulted in the making of methamphetamine by clandestine laboratories in California. Pseudoephedrine is legitimately available through licensed DEA registrants for use in combating head colds. Thomas Narog is such a licensed DEA registrant who operates under the name Seaside Pharmaceuticals. An investigation of Narog began in March of 2000. Narog was interviewed by compliance inspectors from the Drug Enforcement Administration based on the unusually large amounts of pseudoephedrine passing through his pharmaceutical company. Narog operated Seaside Pharmaceuticals from a Shurguard warehouse located in a warehouse district. According to Special Agent Baker's testimony, Narog told investigators in March and in April of 2000 that he had no employees and operated his business by himself. Additionally, Narog told agents that all the pseudoephedrine coming into Seaside Pharmaceuticals was for export out of the United States. The pseudoephedrine coming to Seaside Pharmaceuticals came in pill form in bottles. The bottles bore the label "True Choice."

At the time agents spoke with Narog they were aware of the fact that thousands of bottles of pseudoephedrine bearing the "True Choice" label had ended up in dump sites near clandestine methamphetamine labs in California. On May 23, 2000, 7,000 pounds of pseudoephedrine in pill bottles arrived at Narog's warehouse on thirteen pallets which were four feet by four feet by six feet. On June 1, 2000, surveilling agents saw the Defendant, ALDIN, arrived at the warehouse along with co-defendants Narog and Jaber. Two hundred boxes of the pseudoephedrine were loaded in the back of a U-Haul truck which was backed inside the warehouse. These bottles of pseudoephedrine were taken to a Pack Mail in Kendall and shipped. At 4:00 p.m. that same day, ALDIN and Jaber came back alone to the warehouse. They were driving the U-Haul truck. ALDIN's car was left at the Texaco Station where the U-Haul truck was rented. ALDIN backed the U-Haul truck into the garage door at the warehouse and closed the door behind him. Agents observed nothing for one hour and then ALDIN drove out to 701 N. Broughton Circle in Boynton Beach. Agents then observed the defendants unload boxes into the garage at the townhouse. The co-conspirators then went to a restaurant and came back to the home at 8:00 p.m. ALDIN and Jaber went back to the warehouse, backed in, closed the door, stayed another 45 minutes and then went back to the Broughton Circle address and unloaded more boxes. Activities of this nature continued until June 5th.

Agents learned that during this time period conspirators apparently were emptying the pseudoephedrine pill bottles into one gallon zip-locked bags and were shipping them to various addresses in Orlando and California through commercial carriers. The boxes were all relabeled as books and shoes, etc., but none as pseudoephedrine.

On June 2nd agents observed the Defendant, ALDIN, throw garbage bags into the back of the U-Haul truck and broken-down cardboard boxes which had previously enclosed the pseudoephedrine. They drove to 2200 Seacrest Avenue in Boynton Beach and threw these garbage

bags in the dumpster. This dumpster was approximately five miles from the Broughton residence. There were dumpsters as close as 100 yards away from the townhouse, but ALDIN passed those dumpsters and several others in getting to 2200 Seacrest. After ALDIN left the agents searched the dumpster and found thousands of pseudoephedrine bottles, empty, in the dumpster. There were fifty or sixty 35-gallon trash bags full of the empty bottles of pseudoephedrine.

On June 5th, late Sunday night into early Monday morning, ALDIN and others left the Broughton Circle townhouse and apparently spotted the DEA surveillance. They drove their vehicle very slowly around the DEA surveillance vehicle. At 8:09 a.m., ALDIN drove in the Target Store parking lot near the apartment complex. He drove numerous times through the parking lot for about one half an hour each time. At 8:00 p.m. supervising agents instructed the surveilling agents to stop ALDIN's vehicle and to identify him and to attempt to find out what he was doing in the area.

Agents who are working with the Boynton Beach Police Department, had a uniform Boynton Beach police car stop ALDIN's white Sunbird. The Sunbird had been seen on numerous occasions at the Broughton Circle townhouse. ALDIN himself had been photographed at the Broughton Circle townhouse. DEA Special Agent Collins testified that ALDIN was read his rights from a standard <u>Miranda</u> rights card and indicated that he understood his rights. ALDIN claimed not to know his co-conspirators who were driving in a car near his. ALDIN had two bottles pseudoephedrine in his car with the "True Choice" label. After advised of his rights, ALDIN stated that he had the pseudoephedrine because he has a cold. ALDIN claimed to have never been to the Shurguard warehouse and claimed never to have been at the Broughton Circle address. When agents stopped ALDIN's car no weapons were drawn. ALDIN was never handcuffed. He was asked to accompany the agents to the townhouse which he agreed to do. ALDIN stayed with the agents for several hours at the townhouse and then asked to have a lawyer present. ALDIN was allowed to leave and was not

arrested at that time.

## Discussion

Defendant claims that there was neither probable cause nor reasonable suspicion to stop his car on June 5, 2000. This Court finds to the contrary.

Between March and June of 2000, there is substantial evidence to believe that Thomas Narog was transferring thousands of pounds of pseudoephedrine in violation of federal law. Thomas Narog was a DEA registrant entitled to possess pseudoephedrine. However, Narog could only transfer pseudoephedrine to licensed pseudoephedrine registrants. Prior to June 2000, DEA agents were aware of the fact that Narog was shipping pseudoephedrine from the West Palm Beach area in plastic baggies without the benefit of the boxes containing lot numbers and source codes. Agents had personally observed ALDIN shipping some of those boxes of repackaged pseudoephedrine. Though Narog stated he had no employees, agents observed ALDIN and others back a U-Haul truck into the Shurguard storage facility and move hundreds if not thousands of pounds of pseudoephedrine pills from that storage facility. Narog was in the process of applying for a DEA permit to export pseudoephedrine. In June of 2000, that permit had not yet been issued. Thus, according to Special Agent Baker, Narog could stockpile pseudoephedrine but he could not transfer nor export that pseudoephedrine from the United States because he had no such permit. According to Narog at his diversion interview, his only activity with respect to pseudoephedrine was to export it from the United States. Thus, Narog could not transfer any pseudoephedrine without the export permit. ALDIN could not legally be in possession of pseudoephedrine because he was not a licensed employee of Narog.

Agents had additional evidence of the knowing illegal possession of pseudoephedrine by ALDIN based on the fact that ALDIN gathered thousands of empty pill bottles and boxes in plastic

garbage bags and drove them in a U-Haul truck to a dumpster five miles away from the townhouse where the repackaging was occurring. Additionally, agents were armed with the knowledge that the repackaged pseudoephedrine was being shipped out of West Palm Beach under labels of shoes and books. No package was labeled pseudoephedrine.

Under these facts this Court finds that DEA agents had probable cause to arrest the Defendant, ALDIN, on June 5, 2000. The fact that they chose not to arrest ALDIN at that time, but to merely detain him does not detract from the fact that probable cause to arrest ALDIN existed at that time. Even if agents lacked probable cause to arrest ALDIN on June 5th, they still advised him of his rights per <u>Miranda</u> at the time of the stop. At a minimum, there was articulable suspicion under <u>Terry</u> to stop ALDIN and to determine his identity and to determine whether or not crime as afoot at the time. The agents' testimony is unrebutted that ALDIN was advised of his rights per <u>Miranda</u> and that he understood those rights. The evidence is unrebutted that at no time was ALDIN threatened or coerced in order to get him to give a statement.

Under these facts this Court finds that Defendant's Motion to Suppress Statements should be DENIED in its entirety.

Recommendation

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Daniel T.K. Hurley, within ten (10) days after being served with a copy. <u>See</u> 28 U.S.C. § 636(b)(1)(C). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. <u>See</u> <u>United States v. Warren</u>, 687

F.2d 347, 348 (11th Cir.1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this 14 day of June, 2001.

_____
ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:

AUSA - Laurence Bardfeld
Charles G. White, Esq.