```
                              UNITED STATES DISTRICT COURT
                              SOUTHERN DISTRICT OF FLORIDA

                              CASE NO. 00-6211-CR-HURLEY
UNITED STATES OF AMERICA,

        Plaintiff,
-vs-

RAED NASER ALDIN,

        Defendant.
_____/
```

## MOTION FOR NEW TRIAL OR JUDGMENT OF ACQUITTAL

The Defendant, **RAED NASER ALDIN**, through counsel, and pursuant to Rules 33 and 29 of the Federal Rules of Criminal Procedure, respectfully requests this Court grant him a new trial or judgment of acquittal, and in support thereof would state:

### PROCEDURAL HISTORY

RAED NASER ALDIN was indicted for conspiracy to possess or distribute pseudoephedrine, a List I chemical, knowing or having reasonable cause to believe that it was being used in the manufacture of methamphetamine (Count I). He was also charged with the substantive offense of possessing or distributing pseudoephedrine knowing or having reasonable cause to believe that it was being used in the manufacture of methamphetamine "on or about" June 1, 2000 (Count XI). At the time that the Indictment was returned, and co-defendants were being arrested, NASER ALDIN was in Canada. He contacted Special Agent Joe Collins of the DEA, and

1



eventually agreed to voluntarily surrender to U.S. authorities at the border entry in Detroit, Michigan. He was then transported to the Southern District of Florida. He was given a bond in the case, but also received an immigration hold because of his illegal status in the United States, and has remained in custody since his surrender.

In March, 2001, a Superseding Indictment was returned accusing some co-defendants of possessing pseudoephedrine with the intent to manufacture methamphetamine. NASER ALDIN's charges remained the same.

Shortly after the return of the Superseding Indictment, trial date was scheduled for October 9, 2001. NASER ALDIN and co-defendant Samhan had proposed going to trial separately in June or July, 2001, but the Government had objected on the grounds that separate trials for those two defendants would not appreciably reduce the time of trial compared to a trial of all defendants because of its perceived need to present mountains of evidence against other co-conspirators both listed and unlisted in the Indictment.

After the events of September 11, 2001, the defendants filed a Motion to Continue. The Court heard extensive argument from all parties, and concluded that the prevailing and pervasive bias against Middle-Eastern people because of their association with terrorism was too powerful for the

Court to even attempt to impanel an impartial jury in the aftermath of the attacks on the World Trade Center and the Pentagon. In the process of making its decision, the Court focused on a number of factors which made this case unique. These factors included:

    (a) Many of the terrorists had lived in Palm Beach County, particularly in the South County area of Boynton Beach and Delray;

    (b) Many of the terrorists were either illegal aliens or were residing in the United States in violation of immigration laws;

    (c) The media had reported that terrorists were organized into cells, and that they were frequently engaged in illegal activity, particularly involving narcotics, in order to finance terrorist activity. There was some indication that money from the distribution of pseudoephedrine might have been transported outside the United States, possibly to the Middle East.

A combination of these and other factors ran the risk of tainting the trial by directing the jury's attention from the evidence in the case to a concern about a possible connection with terrorism. In the climate of the times, the defendants would have been compelled to assume the burden of disproving the notion that their activities furthered

3

terrorism. Implicit in the Court's findings was the fear that these prejudices and preconceptions existed to many people as "facts" which would be considered without any further evidence by the Government. This Court was wise in recognizing the inherent unfairness of trying NASER ALDIN and the other defendants of Middle-Eastern origin so soon after the events of September 11, 2001.

On February 4, 2002, trial commenced before this Court in the U.S. District Courthouse in West Palm Beach. Jury selection was extensive and emotional. Despite the Court's instructions to the jury that this case had nothing to do with the events of September 11, 2001, a large number of honest potential jurors confessed their inability to judge fairly these defendants. The Court advised the jury that all of the defendants, including NASER ALDIN, were legally in the United States. The Government had indicated that it would not raise the issue of NASER ALDIN's illegal status, agreeing that it was immaterial. After the jury was selected, trial proceeded. On March 14, 2002, the jury found NASER ALDIN guilty of both Counts I and XI.

### STATEMENT OF PERTINENT FACTS

On June 1, 2000, Special Agents from the DEA and the South Florida Task Force were completing their third month of surveillance on the movement of pseudoephedrine from the

4

Shurguard Warehouse in Fort Lauderdale, Florida to California. Up until June 1, 2000, NASER ALDIN had not been observed in any surveillance.

In the morning of June 1, 2000, NASER ALDIN was observed at the Shurguard Warehouse moving boxes containing pseudoephedrine from Bay No. 206/207 to 1352. Towards the end of this activity, it was decided that Task Force Agent Shawn O'Connor would drive by Bay No. 1352. He did so, and testified that he saw NASER ALDIN looking at his vehicle. Agent O'Connor suggested that there was some sinister motivation behind NASER ALDIN's actions. In fact, the evidence was clear that Bay No. 206/207 had just been prematurely closed by Ghandi Jaber. It was necessary to reopen the door to receive more boxes, and that NASER ALDIN and Motloq Jaber were signaling to Ghandi regarding this circumstance. Even without the evidence of an alternative explanation for NASER ALDIN's conduct, any sinister intent or knowledge attributed to him by Agent O'Connor was based solely upon speculation. There was no evidence that NASER ALDIN made any effort to conceal his activities or take any steps to avoid law enforcement on that day.

Later that day, a U-Haul truck driven by co-defendant Al Haddad came to the Shurguard Warehouse. NASER ALDIN assisted in loading boxes of pseudoephedrine into the U-Haul rental truck.

5

At approximately 5:00 p.m., NASER ALDIN and Motloq Jaber arrived at the Shurguard facility with another U-Haul rental truck. They loaded the U-Haul rental truck with boxes of pseudoephedrine, and took it to an apartment located at 704 Bronough Circle in Boynton Beach. With surveillance following, the truck was emptied. After stopping for dinner at Boston's in Deerfield Beach, NASER ALDIN drove the U-Haul rental truck back to the Shurgard Warehouse. More boxes were then taken to the Boynton Beach townhouse. Law enforcement set up a surveillance on the front of the townhouse.

In the morning of June 2 and 3, 2000, NASER ALDIN was identified driving the U-Haul rental truck away from the townhouse. He was later observed throwing black garbage bags into dumpsters. The examination of the contents of those black garbage bags revealed Tru-Choice pseudoephedrine bottles with the bottoms cut out. Testimony was unequivocal that NASER ALDIN made no effort to conceal his activities.

On June 3, 2000, NASER ALDIN was stopped by a Boynton Beach Police Officer. The stop was at the request of U.S. Customs working on the investigation. NASER ALDIN presented identifications comprising an international driver's license and a world identity card. Both pieces of identification

contained his picture and consistent personal information. At trial, the Government raised the spector that NASER ALDIN was utilizing an alias on these identification documents. This suggestion was based upon the Government's belief that the Defendant's last name was ALDIN. Everyone, including counsel had assumed that it was ALDIN, and that NASER was a middle name. Until the trial, however, it did not seem to make a difference. The Government had never placed NASER ALDIN or his counsel on notice before trial that they would attempt to establish his use of an alias name. The Government also never put NASER ALDIN on notice prior to trial that it would attempt to prove that the identification documents he presented were fake or whether they were fake.

On June 4, 2000, NASER ALDIN was observed driving a white Cadillac on a similar mission to discard the empty True Choice pseudoephedrine bottles in area dumpsters. Again, NASER ALDIN did not make any effort to conceal or disguise his activities.

Shortly after midnight on June 5, 2000, the surveillance on the townhouse was compromised. At approximately 10:15 a.m. that morning, NASER ALDIN was seen driving his white Pontiac Sunbird slowly through the large shopping center on the corner of Gateway and Congress Avenues. Agents claimed that NASER ALDIN was engaged in counter-surveillance. What he was allegedly counter-

7

surveilling was never made clear. The shopping center was far enough away from the Savannah Lakes development where 704 Bronough Circle was located that even if law enforcement was observed by someone looking for it, there would be no way of linking those police to that address. It was simply too far away. Agents had also claimed that NASER ALDIN had engaged in counter-surveillance in the rear area of the Target store where the agents had their staying area. This supposedly happened at approximately 10:00 a.m. one morning before June 5, 2000. The witness emphatically stated that it had not happened on June 4, 2000. Other surveillance evidence for June 2 or 3, 2000, of course, have NASER ALDIN driving the U-Haul rental truck with garbage bags at 10:00 a.m. away from the Savannah Lakes complex. The only other date suggested was June 1, 2000, but that was before there was a surveillance set up at all. In exercising its discretion in considering Motions for New Trial, NASER ALDIN would suggest that the evidence that he engaged in counter-surveillance activities at the shopping center was wholly without merit, and that the opinion of the law enforcement officers attempting to establish his criminal motive be disregarded.

At around 8:00 p.m. in the evening of June 5, 2000, NASER ALDIN was stopped. Also stopped was the white Cadillac containing co-defendants Fneiche and Aquil. NASER

ALDIN, according to Agent Joe Collins, denied "knowing" Fneiche or Aquil. He also denied "having been" at the townhouse. Meanwhile, a search warrant was being executed at the townhouse. NASER ALDIN was brought to the location to observe the agents removing evidence. He was later released. The arrests in this case were not made until almost two months later. After learning that he was under Indictment, NASER ALDIN voluntarily surrendered to the U.S. Immigration and Naturalization Service and U.S. Marshals in Detroit, Michigan.

   NASER ALDIN presented defense testimony and evidence. He admitted to having crossed the U.S. border illegally in November, 1999, and being brought to Palm Beach County by Hasem Jaber, Ghandi Jaber's brother. Shortly after he arrived in Palm Beach County, he met up with Samir Al-Sharif, who he had known back in Palestine. Al-Sharif helped him purchase an automobile, the white Pontiac Sunbird, and signed a lease for the townhouse where NASER ALDIN resided with Motloq Jaber. He testified to having travelled to Canada on a visa on a travel document issued by the Palestinian authority. Al-Sharif corroborated NASER ALDIN's testimony concerning his initial plans on how to support himself in South Florida, and how they changed. Originally, NASER ALDIN was going to become a partner at the KWIK Stop in Delray. Al-Sharif and Ghandi Jaber were

9

already partners in that venture. Later on, Al-Sharif and Ghandi Jaber decided to sell the KWIK Stop in order to open a Middle-Eastern restaurant they named the Pita Inn. Ghandi Jaber and Al-Sharif signed a commercial lease for the Pita Inn on Atlantic Blvd. in Delray. The partners were putting their money into renovating the space, and preparing the restaurant to open for business.

NASER ALDIN did not see anything unusual with being hired by Ghandi Jaber to rent a U-Haul and transport boxes of what he believed were cough medicine from the Shurgard Warehouse to the Boynton Beach townhouse. When he saw that the bottles were being cut open, and the pills were being placed in clear plastic bags, he asked Ghandi Jaber what was going on. He was told that the pills were being repackaged for export to save money. NASER ALDIN claimed no knowledge that the cough medicine he was handling could be used to manufacture methamphetamine.

The Government did not directly challenge NASER ALDIN's explanation for his activities from June 1-5, 2000. The single exception was the Government's claim that NASER ALDIN was a fluent speaker of English who understood everything that was happening when he was confronted by Agent Collins on June 5, 2000. This was a straw man argument on the Government's behalf. NASER ALDIN never claimed he did not speak English. He only claimed that he did not speak it that

well, and may have misunderstood the precise meaning of the questions propounded by Agent Collins. In fact, contrary to the suggestions of Agent Collins, NASER ALDIN not only admitted a connection to the Boynton Beach townhouse, but presented evidence that he lived there for the three months preceding the surveillance. As to whether he "knew" Fneiche and Aquil, he clarified that he did not know them in any real sense although he was acquainted with them. The Government also focused on his surreptitious entry into the United States, and his illegal status.

During closing arguments, the Government's strategy became clear. Although counsel acknowledged that NASER ALDIN was illegally in the United States, he argued that NASER ALDIN had used his name to (1) purchase the white Pontiac, (2) rent the U-Haul rental truck both to move his furniture out of the Boynton Beach townhouse and the boxes of pseudoephedrine, and (3) acquire the identifications presented to the police when he was stopped on June 3 and 5, 2000, and (4) open the bank account to receive the money from the Middle East which he used to invest in the Pita Inn.

On rebuttal, the Government abandoned all restraint and engaged in a character assassination of NASER ALDIN. Apparently stymied by the revelation that NASER ALDIN was the Defendant's family name, and that he was not disguising

11

his name, the Government decided to take that next step and declared to the jury the following as paraphrased:

> The Government does not know who [the defendant] really is!

The Government then declared as a factual matter, and without evidentiary support, that the identification documents presented by NASER ALDIN were "fake". NASER ALDIN objected, and made a Motion for Mistrial based upon improper comments by the prosecutor at closing argument. That Motion was denied. The Government then expanded dramatically the scope of its accusations against NASER ALDIN by suggesting to the jury that the five bottles of True Choice found in his car on June 5, 2000, were samples which were going to be delivered to methamphetamine laboratories. There was absolutely no evidentiary basis for this accusation, and nothing in the case, including the Government's cross-examination of NASER ALDIN, supported that theory.

After the Government had rested its case-in-chief, NASER ALDIN made a Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure. NASER ALDIN argued that his guilty knowledge could only be established based upon a subjective standard. NASER ALDIN argued that the evidence was legally insufficient to justify a finding of guilt because there was no evidence of direct knowledge of the illegal use of the pseudoephedrine, and

12

insufficient proof established by the Government that NASER ALDIN had reasonable cause to believe that the pseudoephedrine would be used to manufacture methamphetamine. There was no evidence of actual notice to NASER ALDIN that pseudoephedrine could be manufactured into methamphetamine. Based upon a subjective standard, it was not what a reasonable man would gather from the circumstances in the case, but what specifically NASER ALDIN understood was going on, that had to be established beyond a reasonable doubt.

The Government argued, and the Court agreed that the circumstances surrounding the activities at the Boynton Beach townhouse would give a so-called reasonable man an understanding that something illegal was going on. This applied the objective standard, and was the basis of the Court's ruling.

When it came time to consider jury instructions, however, the District Court rejected the objective standard presented by the Government. Instead, the Court acknowledged that a subjective standard particular to an individual defendant needed to be established by the evidence in order to sustain a guilty verdict. At the same time, the Court rejected the notion that NASER ALDIN had consciously avoided knowing the truth about the pseudoephedrine.

13

During deliberations, the jury posed the question of whether the Government had to prove specifically that the defendants knew that the pseudoephedrine in question was being used to manufacture methamphetamine or could it be any controlled substance. After considering the arguments presented by the defendants, the Court instructed the jury over their objections that it could establish "a reasonable cause to believe" if the defendants believed that any controlled substance was going to be manufactured from the pseudoephedrine. NASER ALDIN contends that this supplemental instruction (1) mistated the law, (2) undermined the subjective standard set forth in the main jury instructions, (3) constituted a variance between what was alleged and proven at trial, and (4) constructively amended the Indictment by expanding the scope of the charges.

<u>GROUNDS FOR NEW TRIAL</u>

1. Improper argument by prosecutor. Prosecutor argued as fact matters not proven which existed either outside the Record or were false. These statements which prejudiced NASER ALDIN by suggesting he was a terrorist mole travaelling with false documentation and accusing him of criminal conduct, such as delivering samples of pseudoephedrine to methamphetamine laboratories, which could also not be proven and were, in fact, false.

2. Without prior notice, and with insufficient proof, the Government introduced evidence that NASER ALDIN had falsified identification documents which he presented to the police in order to disguise his identity. NASER ALDIN was prejudiced because the Government made an issue of his correct name which before trial was not an issue. This left his counsel with the embarrassment of having to correct his client's name in the middle of the trial.

3. District Court erred in its supplemental instructions in response to a jury question concerning the definition of "reasonable cause to believe". In its response, the District Court constructively amended the Indictment, created a variance between what was alleged and what was proven, and contradicted its other instructions concerning the Government's burden to prove knowledge and intent.

The resulting verdict of guilty was contrary to the law and the evidence. To the extent that consideration of all the evidence in its light most favorable to the Government, it was insufficient, NASER ALDIN would request a judgment of acquittal to every other extent, NASER ALDIN would request a new trial. Under separate cover, NASER ALDIN will present the Court with a Memorandum of Law more fully explaining his entitlement to relief.

15

THEREFORE, the Defendant requests this Court grant him a new trial or a judgment of acquittal.

Respectfully submitted,

CHARLES G. WHITE, P.A.
Counsel for Defendant
1031 Ives Dairy Road
Suite 228
Miami, Florida 33179
Tel:  (305) 914-0160
Fax:  (305) 914-0166
Florida Bar No. 334170

_____
CHARLES G. WHITE, ESQ.

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 3rd day of April, 2002, to: THOMAS O'MALLEY, ASST. U.S. ATTORNEY, 500 E. Broward Blvd., 7th Floor, Fort Lauderdale, FL 33394; and defense counsel listed below.

RICHARD HAMAR, ESQ.
2437 Briarcrest Road
Beverly Hills, CA 90210
(Counsel for MOHAMMED SAMHAN)

JOHN R. HOWES, ESQ.
633 S.E. Third Ave., # 4F
Fort Lauderdale, FL 33301
(Counsel for RABAH EL HADDAD)

TIMOTHY BIASIELLO, ESQ.
33 N. Deerborn St., # 1015
Chicago, IL 60602
(Counsel for NIZAR FNEICHE)

FRED HADDAD, ESQ.
One Financial Plaza, # 2612
Fort Lauderdale, FL 33394
(Counsel for THOMAS NAROG)

_____
CHARLES G. WHITE, P.A.
Counsel for NASER ALDIN
1031 Ives Dairy Road
Suite 228
Miami, Florida 33179
Tel: (305) 914-0160
Fax: (305) 914-0166
Florida Bar No. 334170

17