UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6211-CR-HURLEY

UNITED STATES OF AMERICA,

        Plaintiff,

-vs-

RAED NASER ALDIN,

        Defendant.
_____/

FILED

AUG 27 2002

ERK, USDC / SDFl

### RESPONSE TO GOVERNMENT'S NOTICE OF NASER ALDIN'S OBSTRUCTION OF JUSTICE AND/OR ALTERNATIVELY, GOVERNMENT'S OBJECTION TO PRE-SENTENCE INVESTIGATION REPORT

The Defendant, **RAED NASER ALDIN**, through counsel, hereby responds to the Government's Notice of Naser Aldin's Obstruction of Justice and/or Alternatively, Government's Objection to Pre-Sentence Investigation Report, and would state:

1. The Government has sought to isolate ten statements made by NASER ALDIN under oath during his trial testimony and argue that they were perjurious in order to qualify him for a two-level enhancement under U.S.S.G., Section 3C1.1.

2. Relying on the Government, the Pre-Sentence Investigation (hereinafter "PSI") had originally detailed certain statements made by NASER ALDIN during his trial testimony, and declared them false. At the sentencing hearing conducted on May 29, 2002, those efforts failed. The hearing was recessed, and the Government was given the oppportunity to present additional allegedly false

1

statements. At 12:48 p.m. on August 27, 2002, the afternoon before the reset sentencing hearing, the Government finally provided counsel with notice of additional statements it relies upon to establish NASER ALDIN committed perjury when he testified at trial. Despite such short notice, NASER ALDIN offers the following argument, but reserves the right to supplement his Response at the hearing.

3. Underlying the Government's position was the fact that the jury chose to convict NASER ALDIN despite his testimony. What the Government failed to realize is that the jury might well have convicted NASER ALDIN based upon the theory embodied in the Court's answer to their last question posed during deliberations. The jury wanted to know if they could find the Defendant had "reasonable cause to believe" that the pseudoepherine was being used in the manufacture of some unspecified controlled substance, and not the methamphetamine charged in the Indictment, and still convict. The jury could have believed everything that NASER ALDIN said when he testified, but still believed that the circumstances were suspicious enough that he must have known that he was doing something wrong. Since NASER ALDIN admitted that the circumstances were suspicious and his lack of knowledge concerning the connection between pseudoephedrine and methamphetamine was not a defense, his conviction was assured. In this context, NASER ALDIN will

now address each of the Government's allegations of perjury.

4. <u>Movement of pseudoephedrine between warehouse units</u>: NASER ALDIN testified that he was moving pseudoephedrine between warehouse units at the Shurguard Warehouse because he believed that Ghandi Jaber wanted to store garbage, waste, and unused boxes. The Government contends that this was a lie because the real purpose was so El Haddad would not know where all the pseudoephedrine was being stored. While that was certainly their theory, and might very well have been the reason why Ghandi Jaber wanted the pseudoephedrine moved, the Government had not presented any evidence that NASER ALDIN was aware of that purpose. In order to state a finding of perjury, the Government must be able to prove that NASER ALDIN knew the truth, and consciously chose not to utter it.

5. <u>Countersurveillance at Shurguard Warehouse</u>: The Government claimed that NASER ALDIN lied when he testified that his gestures captured on the video tape were not concerning the drive-by undercover vehicle. The video tape evidence in conjunction with the testimony of the surveillance agent clarified the fact that immediately before NASER ALDIN gestured to him, Ghandi Jaber had closed one warehouse door, and began to bring a dolly full of boxes to the other, and then after NASER ALDIN gestured to him, reopened the first warehouse door to remove more boxes of

3

pseudoephedrine to bring to the second. Logic suggests that if NASER ALDIN was trying to alert Ghandi Jaber to the presence of a suspicious vehicle, and he believed that he was doing something wrong, the movement of the boxes would have immediately stopped. Ghandi Jaber would certainly not have reopened the warehouse door after being alerted to a problem with surveillance. The Government cannot prove, and the jury's verdict did not establish, that NASER ALDIN's actions were motivated by anything other than what he testified about. The appearance of the gesture on the video tape at the time of the undercover vehicle drove by was purely coincidential, the Government cannot prove otherwise. Just because their theory was contradicted by NASER ALDIN's testimony does not make that testimony perjurious.

6. <u>Reason for disposing of garbage bags in multiple dumpsters</u>: The Government maintains that NASER ALDIN lied when he told the jury that he placed the garbage bags filled with empty bottles of Tru-Choice in multiple dumpsters because he did not want to fill any one dumpster up. He wanted to leave room for other people's garbage. There was nothing that the Government introduced into evidence that proved NASER ALDIN was lying. In fact, the testimony of the surveillance agents indicated that NASER ALDIN openly disposed of these garbage bags. When surveillance agents drove to within 30 yards of where NASER ALDIN was throwing

4

garbage bags into dumpsters there was no break in the activity. There was no effort made by NASER ALDIN to conceal or hide his movements when he disposed of the garbage bags. It is only the Government's theory, not backed by any evidence, that use of multiple dumpsters assisted NASER ALDIN in concealing his activities. Given the totality of the observations made of NASER ALDIN, he was not attempting to conceal his activities. The jury's verdict did not support the Government's contentions regarding the reason for disposing the garbage bags in multiple dumpsters. What may have swayed the jury was the evidence showing the disposal of empty bottles of a legal drug might have risen to the level of suspicion necessary for someone to have a "reasonable cause to believe" that something illegal was being manufactured, without a clue as to what it was.

7. <u>Reason for driving in Target shopping center alley</u>: NASER ALDIN did testify that he drove in the Target alley because it was a short-cut. Gary McDaniel also testified as a defense witness, and showed photographs to the jury that proved it was a short-cut. The Government did not prove that the alley was not a short-cut. The Government also claimed that NASER ALDIN lied when he said that he went shopping at Target on June 5, 2000. The Government has no evidence to disprove that fact. Although surveillance agents

5

claimed seeing him in back of the Target, they could not see the front of the Target. There was no evidence to suggest that all of NASER ALDIN's movements on that day were subject to police surveillance. The Government woefully failed to establish that NASER ALDIN engaged in countersurveillance at the Target on June 5, 2000. In the portion of the PSI devoted to Relevant Conduct there is no mention of NASER ALDIN's alleged countersurveillance. It defies logical sense that NASER ALDIN or anyone connected to the townhouse where the pseudoephedrine was packaged would go to a nearby shopping center to conduct surveillance.

8. <u>Failure to remember June 5th advice of rights</u>: NASER ALDIN testified at trial that he did not recall having been advised of his <u>Miranda</u> rights on June 5, 2000. The Government claims that his invocation of his right to counsel later that evening establishes that testimony as being perjurious. NASER ALDIN had spoken to Ghandi Jaber while the pseudoephedrine was being removed from the townhouse and he told NASER ALDIN to demand to speak to a lawyer. Ghandi Jaber knew what the pseudoephedrine was being used for.

The Government also claims that NASER ALDIN lied when he insisted that on June 5, 2000, his English was not very good. He never said that he knew no English, only that it had not been very developed in the six months he had been in

6

the United States living and working primarily with other Arabs. His language skills lacked precision necessary to find that he willfully feigned ignorance of English. When he testified, he allowed for the fact that he may have misunderstood exactly what Agent Collins was asking. The fact that Agent Collins claimed that NASER ALDIN understood him does not make it so. It certainly does not rise to positive proof that NASER ALDIN was lying. Interestingly enough, the Government claimed that NASER ALDIN's allegedly feigned misunderstanding of English contributed to his assertions that he was living at another rental unit on June 5, 2000. In fact, as the Government well knew, NASER ALDIN had moved to another location on Seacrest Drive in Delray Beach on or around the end of May, 2000. He had been followed to that location by surveillance agents prior to June 5, 2000. At trial, NASER ALDIN admitted that he had resided at the Boynton Beach townhouse during the approximately three months prior to that move.

9. <u>Claim to have invoked right after talking to Jaber on cell telephone while at the scene of the Boynton Beach townhouse</u>: The Government claims that NASER ALDIN lied when he testified to having spoken to Ghandi Jaber on June 5, 2000, invoking his right to counsel. By way of proof, the Government offered a supposed contradiction between that assertion and his direct testimony where he said he

7

contacted Ghandi Jaber after his release. The obvious answer to the Government's argument is that NASER ALDIN spoke to Ghandi Jaber twice that night. The Government also makes reference to testimony it intends to offer at NASER ALDIN's sentencing that supports its position on this point. NASER ALDIN would guess that Agent Collins will be the only witness called. Before determining the correctness of Agent Collins' testimony, the Court should hear from all the police officers/agents who had contact with NASER ALDIN that evening. That testimony should substantiate NASER ALDIN's assertion that he was allowed to communicate with outsiders while detained.

10. <u>Knowledge of identities of co-defendant Aquil and Fneiche</u>: The Government claims that NASER ALDIN really "knew" Aquil and Fneiche, but falsely denied that knowledge. What NASER ALDIN testified to was understanding Agent Collins' questions as referring to more than a passing aquaintance with Aquil and Fneiche or really anything about them except for very limited knowledge gained through brief contacts. The fact is that NASER ALDIN did not know Aquil and Fneiche. They were from Chicago, and had only been in town for a couple of days. He had had little contact with them. The contact that he had had with them did not warrant in his mind the understanding that he knew them in any meaningful sense. The Government has failed to establish

the scope of knowledge that NASER ALDIN was allegedly trying to conceal.

11. <u>Presence at Boynton Beach townhouse</u>: Agent Collins could not be sure of exactly how NASER ALDIN interpreted his question concerning the Boynton Beach townhouse. Was he asking NASER ALDIN if he had just come from the townhouse? Was he asking NASER ALDIN had he had once lived in the townhouse? Was he asking NASER ALDIN if he currently lived in the townhouse? Was he asking NASER ALDIN had he had ever visited the townhouse? How did Agent Collins identify the townhouse? While Agent Collins might believe that he was asking NASER ALDIN whether he had just or ever been at the townhouse, NASER ALDIN believed that he was asking him whether he lived there. This is the kind of honest misstatement or misinterpretation of the question that does not sustain an allegation of perjury. Again, NASER ALDIN was living elsewhere on June 5, 2000, as previously set forth above.

12. <u>Reason for pseudoephedrine in Aldin's car</u>: The Government attempted to suggest in argument that NASER ALDIN had five bottles of pseudoephedrine in his car because he was going to show them as samples to methamphetamine laboratories. There was absolutely no evidence that NASER ALDIN occupied or was supposed to occupy such a role in this pseudoephedrine operation. NASER ALDIN submits that the

9

Government's argument was improper because it was not based on any evidence in the Record or any reasonable inferences that could have been drawn from that evidence. It was uncontroverted that the methamphetamine laboratories which were receiving pseudoephedrine were located in California. It was also uncontroverted that there was no evidence that NASER ALDIN was going to take those five bottles to California to shop them around at methamphetamine laboratories. It may be that one of the reasons why this jury convicted NASER ALDIN was because of the Government's improper suggestions, but in the absence of any evidence to contradict NASER ALDIN's statement, perjury cannot be established.

13. <u>Lack of knowledge of criminal activity</u>: NASER ALDIN did not know until after his Indictment in this case that pseudoephedrine is used in the manufacture of methamphetamine. The jury was allowed to convict him, however, despite this lack of knowledge because it could find that the circumstances surrounding his activities gave him "reasonable cause to believe" that something illegal was being manufactured, even if he did not know what it was. There was nothing about his testimony that contradicted the Government's proof. The Government was able to circumvent these assertions, and the jury was given license to disregard it. It no longer mattered whether NASER ALDIN

10

knew that methamphetamine production was the use that the pseudoephedrine would or even could be applied. NASER ALDIN maintains that if the Government had been put to the burden of proving that NASER ALDIN knew of the connections between pseudoephedrine and methamphetamine, he would have been found not guilty.

As for his statement concerning the link between his detention on June 5, 2000, and the pseudoephedrine found in the Boynton Beach townhouse, the Government oversimplified the circumstances of the event. NASER ALDIN was stopped, and he testified that he did not know that his initial stop was related to the pseudoephedrine. According to all the witnesses who testified, that appeared to be an accurate statement because no one was questioned at the original scene about the pseudoephedrine. Later on, NASER ALDIN was taken to the Boynton Beach townhouse from where he saw pseudoephedrine being removed by agents. He certainly learned at that point that his detention was somehow related to pseudoephedrine. Although armed with this knowledge, NASER ALDIN was released with no charges filed. He remained in South Florida for approximately six weeks after June 5, 2000, which is certainly inconsistent behavior for someone who believes they had done something wrong. This is not perjury, but the honest description of his state of mind at the moment of detention. The Government cannot stretch the

import of that remark to encompass the entire episode and then take it out of context. The Government has not established any perjury on NASER ALDIN's part for his testimony about June 5, 2000.

THEREFORE, the Defendant responds to the Government's efforts to enhance his sentence based upon obstruction of justice.

I HEREBY CERTIFY that a true and correct copy of the foregoing was hand-delivered and mailed this 28th day of August, 2002, to: WILLIAM T. ZLOCH, ASST. U.S. ATTORNEY, and THOMAS O'MALLEY, ASST. U.S. ATTORNEY, 500 E. Broward Blvd., 7th Floor, Fort Lauderdale, FL 33394, fax (954) 356-7336; and SHEILA TIERNEY, USPO, U.S. Probation Office, 501 S. Flagler Drive, Suite 400, West Palm Beach, FL 33401, fax (561) 655-1049.

Respectfully submitted,

CHARLES G. WHITE, P.A.
Counsel for Defendant
1031 Ives Dairy Road
Suite 228
Miami, Florida 33179
Tel: (305) 914-0160
Fax: (305) 914-0166
Florida Bar No. 334170

CHARLES G. WHITE, ESQ.

12